FILED
2012 Apr-12  PM 02:24
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CATHY McCAY-JONES,             )
                               )
              Plaintiff,        )
vs.                            )        Case No.       2:09-cv-2286-TMP
                               )
UTILITY METER                  )
SERVICES, Inc.,                )
                               )
              Defendant.        )


## REPORT AND RECOMMENDATION

This action is before the court on the motion for summary judgment filed May 2, 2011, by the defendant, Utility Meter Services, Inc. ("UMS"). After seeking and receiving an extension of time, plaintiff Cathy McCay-Jones responded to the motion by filing a brief in opposition and supporting exhibits on June 13, 2011. The defendant submitted a reply brief on June 24, 2011, and a motion to strike portions of the evidence offered by plaintiff.[1] Plaintiff then sought to supplement her response, and a supplemental brief was deemed filed on November 28, 2011, along with a supplemental reply brief filed by the defendant. The parties have not consented to the exercise of jurisdiction by the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c); accordingly, the court enters this report and recommendation.

---

1       The motion to strike challenges the plaintiff's evidence relating to other lawsuits and EEOC complaints filed against UMS in which female employees made claims of gender discrimination and to other allegations of gender bias made against a UMS manager. Defendant further seeks to strike as hearsay plaintiff's statement that two co-workers told her that her supervisor had said plaintiff was causing trouble. None of the evidence defendant has moved to strike has been considered by this court in reaching its recommendation to deny the motion for summary judgment. Because the evidence made the subject of the motion to strike has not been considered by the court in resolving the instant motion, the motion to strike (doc. 46) is MOOT. Defendant is not precluded from raising these evidentiary issues *in limine* or at trial.

## I.  SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56 (c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56 (c)).  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56 (e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. At 324 (quoting Fed. R. Civ. P. 56 (e)).  The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. Celotex, 477 U.S. at 324.  "[T]he plain language of Rule 56 (c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.  After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of

material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56 (c). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. At 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. Anderson, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II.  FACTS

Viewing the evidence in the light most favorable to the non-moving plaintiff, the following undisputed facts are relevant to the instant motion.

Defendant UMS is a company that provides meter-reading services to the utility industry in several states, including Alabama.  Plaintiff McCay, a female, was employed by UMS from October 2003 until September 6, 2007.  She was hired to work as a meter reader at the defendant's Helena, Alabama, facility.  She received favorable evaluations and pay raises during the course of her employment.  At times during her employment, William Nickles, a male who became her supervisor, "hit on" her, made repeated comments to her about her appearance, and told her she was "hot."  A coworker, Brian Hardin, told her that he "would like to pick the ticks off [her]."  While working as her supervisor, Nickles told plaintiff that a man would be in a better position to handle the job as a lead.

Hardin's job title was "lead meter reader."  A "lead meter reader" fulfilled the duties of a meter reader, but also had additional duties and was paid at a higher rate.  The defendant refers to what appears to be the same classification of job as "lead foreperson," and witnesses in deposition referred to those who held that job classification generally as "leads."  McCay asserts that she was a "lead" after May 2007, because her supervisor, Nickles, told her she was a "lead," her pay was raised to $13 per hour, which is "lead pay," and because her May 2007 evaluation states:  "Moving to a lead position."  (Doc. 43-1).[2]   Additionally, she attended management meetings as a "lead," during which lead responsibilities were discussed and assigned.  Plaintiff further offers the testimony

---

2    The defendant asserts that the "lead" position was offered to plaintiff in May 2007, but that she subsequently turned it down, and that the pay raise was nonetheless given to her, based on merit, not to reflect her status as a "lead."

4

of a co-worker that plaintiff performed duties that were assigned to "lead" workers.  (Doc. 38-31, Bentley Depo., pp. 13-16).[3]

Plaintiff discovered in 2007 that the other lead meter readers, all of whom were male, were allowed to take their work trucks home after work instead of leaving the trucks in the parking lot. Nickles told her that taking the trucks home was a "perk" for leads.   When she protested that she was a lead and should be allowed to take her truck home, Nickles told her that she was not recognized as a lead, and that men were in a better position to handle the job of a lead than women. After this conversation, McCay complained to Bobby Smith, regional manager for UMS, and to Ted LaVenture, general manager of operations for UMS.    She voiced several complaints about workplace issues, and also told him that she was "not treated fairly as a woman" in the workplace. (Doc. 38-1, McCay Depo., p. 127).  After she did so, Nickles, her supervisor, approached her and said that she "is going to mess it up for everyone" by complaining.  (Id. pp. 93-95).

Ten days after she complained about her treatment on the job, McCay's employment with UMS ended.  Although the parties dispute how this occurred, McCay says that other employees, including the male leads, knew that she had complained about the unfair treatment of women at UMS.   One of them, River D'angelo, followed her at work and told her that she should stop complaining.  She became very upset about D'angelo's questioning, and told Nickles that she was too upset to work that day, but would be back the next day.  Nickles reported the incident to Smith. When McCay came to work the next day, Smith came to the facility, told her that she was no longer needed, and "dismissed" her.[4]

---

3    Defendant argues that the some of the duties of leads and meter readers were interchangeable and that some meter readers were paid more than leads.  At least, there exists a fact dispute as to whether plaintiff was a lead, and, therefore, whether Hardin had any supervisory authority over her.

4      Nickles has testified that the plaintiff showed him a letter of resignation, but told him she was *not* ready to turn it in yet.  Nickles also stated that McCay told him, as she left the office the day of

During the relevant period of time, UMS had in effect a policy prohibiting sexual harassment. McCay was aware of the policy, and she made complaints to Smith and to Ted LaVenture, the general manager of operations.  Smith told her that her complaints would be investigated.[5]

On September 21, 2007, McCay filed a charge of discrimination with the Equal Employment Opportunity Commission, alleging gender discrimination and retaliation.  On August 13, 2009, she received a right-to-sue letter.  On April 20, 2010, she commenced this action, bringing claims that her employer violated Title VII of the Civil Rights Act of 1964.  She alleges that she received disparate treatment on account of her gender, and that she was terminated because of her gender and/or in retaliation for having complained of discrimination.

## III. DISCUSSION

Defendant seeks summary judgment on all of plaintiff's claims.  Specifically, the defendant asserts that McCay's disparate treatment claim is due to be dismissed because she was not a "lead," and therefore any difference in treatment was not relevant; and that her termination was not discriminatory or retaliatory because McCay was not terminated, but resigned.[6]

the D'Angelo confrontation, that she was getting a lawyer and would be back "with a vengeance." The variances between the depositions and declarations offered in support of the motion for summary judgment indicate that whether plaintiff resigned or was fired presents a question of fact. The evidence offers support for a fact finding that the defendant believed plaintiff had resigned, but the evidence also supports a finding that the plaintiff intended to continue working there, as evidenced by the fact that she reported for duty, dressed in her uniform, the day after the supposed resignation.  Contrary to defendant's recitation of the facts in its brief, McCay was questioned directly in her deposition about the statements she made to Nickles that day, and she expressly denied saying that she was quitting, that she was headed to the unemployment agency, or that she would return "with a vengence."  See McCay Depo., pp. 107-108.

5    Defendant has not raised a Faragher/Ellerth defense.

6    The defendant labels its defense to this claim as being that the employer has articulated a non-discriminatory reason for the employment action and the plaintiff has failed to demonstrate that

Although the defendant has briefed claims of sexual harassment and failure-to-promote, the plaintiff has asserted that the only claims she is pursuing are "disparate treatment during her employment based on failure to take her truck home and other treatment; termination based on her gender; and termination based on retaliation." (Doc. 42, p. 2 n.1). She further concedes that the promotion claim is untimely, and that she is not asserting a claim for sexual harassment or constructive discharge. Id. Accordingly, insofar as the complaint might allege claims for denial of promotion and sexual harassment/constructive discharge, the motion for summary judgment is due to be granted as to those claims. Therefore, the discussion below deals with plaintiff's only three claims: (1) that she was discriminatorily denied the same employment terms and conditions as male "leads," (2) that she was discriminatorily discharged based on gender, and (3) that her discharge was retaliatory for having complained about sex discrimination in her employment.

## A. Disparate Treatment

Title VII prohibits discrimination with respect to an employee's "compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a). Specifically, the statute provides that it shall be unlawful for an employer:

> to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

---

the reason is pretext. But the issue is not whether the defendant's reason is pretext; rather, the issue is one of fact: whether the plaintiff resigned or was fired. Plaintiff contends that she was fired from her job and that the defendant's assertion that she quit is simply false.

42 U.S.C. § 2000e-2(a)(1).  A plaintiff may prove a *prima facie* case of discrimination by establishing that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she is qualified to do the job; and (4) her employer treated similarly situated employees who are not members of the protected class more favorably.  See Maniccia v. Brown, 171 F.3d 1364, 1368 (11th Cir. 1999).  "The methods of presenting a *prima facie* case are not fixed; they are flexible and depend to a large degree upon the employment situation."  Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004) citing Nix v. WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185 (11th Cir. 1984).  A disparate treatment claim requires proof of discriminatory intent, either through the use of direct or circumstantial evidence.  See, e.g., Equal Employment Opportunity Commission v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1286 (11th Cir. 2000).

Plaintiff's claim that she received disparate treatment because of her gender hinges upon her claim that male leads were allowed to take their work trucks home and she was not.  (Doc. 42, pp. 18-20).[7]  The defendant asserts that excluding McCay from the truck policy was based on her job classification, not her gender.  UMS asserts that McCay was not a lead, and that only leads were allowed to take the trucks home.  McCay has presented evidence, however, that she was a lead: the evaluation form that states "Moving to a lead position," and testimony that her pay was "lead pay."  In addition, plaintiff has offered  testimony that she performed the same duties as leads and attended meetings with them, but that she was not "regarded" as a lead because of defendant's position that

---

7       Other complaints plaintiff makes in her deposition or brief, relating to sexual comments made to her, or difficulty getting help with the computer, do not rise to the level of an actionable disparate treatment claim.  The comments were relatively mild and infrequent; and the computer problem applied to male workers as well as to her.  Indeed, even plaintiff argues that the evidence is relevant only show that the workplace was rife with sex discrimination and how this affected the employment decisions she does challenge.

8

men were in a "better position" to do lead work than women.  While the defendant counters that she was offered a lead position but turned it down, the facts must be viewed in the light most favorable to the plaintiff.[8]  For purposes of the instant motion, plaintiff must be considered as holding a "lead" position, who was denied one of the "perks" given to male leads.[9]  Accordingly, the motion for summary judgment as to the claim is due to be denied because there exists a genuine issue of material fact as to this claim.

### B. Termination on the Basis of Gender or as Retaliation

In addition to the elements of a gender-based discrimination claim, discussed above, to establish a claim of retaliation under Title VII, a plaintiff must prove that she engaged in statutorily protected activity, she suffered a materially adverse employment action, and there was some causal relation between the two events. Goldsmith v. Bagby Elevator Co, Inc., 513 F.3d 1261, 1277 (11th Cir. 2008), citing Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 126 S. Ct. 2405, 2410-16, 165 L. Ed. 2d 345 (2006).  While the causal link is broadly construed to require plaintiff to prove little more than that the adverse action and the protected activity were not "wholly unrelated," it nevertheless is well settled that the plaintiff "must generally show that the decision

---

[8]     Defendant further asserts that the reason for the pay increase was "merit," and not being placed in the lead position. But plaintiff testified that she had never seen the document indicating that the pay was a merit raise.  Furthermore, a "merit raise" and a promotion to lead are not mutually exclusive.   Defendant's assertion that meter readers and leads often performed the same duties and that some meter readers were paid more than leads, makes even more confusing the alleged dichotomy in "perks."

[9]     The defendant does not dispute that the use of work trucks to commute to work constitutes a term or condition of employment not worthy of protection against discrimination.

maker was aware of the protected conduct at the time of the adverse employment action."
Goldsmith, 513 F.3d at 1278.  It is not sufficient that plaintiff show merely that someone in the
defendant's organization knew of the protected activity; rather, the plaintiff must show that the
person who engaged in the alleged retaliatory act was aware of the protected activity.  See Tucker
v. Housing Authority of Birmingham, 229 Fed. Appx. 820, 2007 WL 10345761 (11th Cir. 2007).
The Eleventh Circuit Court of Appeals has clearly stated that "summary judgment cannot be avoided
based on hunches unsupported with significant probative evidence."  Raney v. Vinson Guard
Service, Inc., 120 F.3d 1192, 1198 (11th Cir. 1997).

          The defendant moves for dismissal of plaintiff's gender-based termination claim on the
grounds that plaintiff was not fired, but resigned, and, further, even if plaintiff was fired, that she has
failed to show that any male employee "exhibited the same, unacceptable behavior" of verbally
resigning and threatening to return "with a vengeance."   Both of these grounds are based on the
purported fact that plaintiff told Nickles that she was resigning.  Plaintiff disputes Nickles' version
of events.  If plaintiff did resign, then there is no factual basis for any termination claim.  Whether
she was fired or resigned, however, presents a genuine issue of material fact, as discussed above.
While UMS points to evidence that McCay stated that she "was giving notice," plaintiff herself has
testified unequivocally that she did not tell Nickles that she was resigning, but only taking the day
off due to the stress of her confrontation with D'Angelo.  She testified clearly that she told Nickle
that she would return to work the next day.  Moreover, even the evidence cited by defendant
indicates that Smith "dismissed" plaintiff.  Nickles testified that when McCay verbally resigned, she
was crying and was "hysterical," and that Smith "dismissed" her the next day.  Finally, Nickles' own

deposition indicates that, although McCay had written a letter of resignation, she would not give it to him.  (Doc. 38, Ex. 3, Nickles Depo., pp. 126-29, 179).  Clearly there is a genuine dispute of fact about whether McCay voluntarily resigned her employment or was involuntarily dismissed.

Insofar as plaintiff complains that the decision to terminate her was gender-based discrimination, she has pointed to no similarly situated male lead employee who was treated more favorably (i.e., not fired) after leaving and refusing work due to an emotional disturbance. Regardless of what she said to Nickles (and the court assumes that she told Nickles what she has testified to), it is not disputed that, after her confrontation with D'Angelo, she was crying and upset, and told Nickles that she could not work that day, and left job site.  With no other facts, defendant contends that this would establish as legitimate, non-discriminatory basis for terminating her employment.

The existence of significant evidence that the defendant did not "honestly believe" that the plaintiff resigned her employment is itself an adequate basis from which a jury could conclude that an illegal animus motivated the termination.  As the Eleventh Circuit noted in Wilson v. B/E Aerospace, Inc., 376 F.3d 1079 (11th Cir. 2004):

> In Reeves [v. Sanderson Plumbing Products., Inc., 530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)], the Supreme Court explained that "it is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." 530 U.S. at 147, 120 S. Ct. at 2108.  A plaintiff may be able to establish that the employer's asserted justification is false and a pretext for discrimination based on some of the same evidence that established a prima facie case of discrimination.  Id.  A plaintiff need not "always introduce additional, independent evidence of discrimination." Id. at 148, 120 S. Ct. at 2109.

Id. at 1091.  This is not a case where the plaintiff is quibbling about the reasons for action being taken against her.  She contends here that the assertion that she resigned her employment is simply false, based on fabricated information.  She testified in her deposition that she did **not** tell Nickles she was giving her notice, did **not** say that she was headed to the unemployment agency, and did **not** say that she would return "with a vengeance."   See Doc. 38-1, McCay Depo, p. 108.   The contradictory evidence among even the defendant's own witnesses raises serious questions about the truth of the assertion that plaintiff resigned her employment.  Viewing the evidence favorably to the non-moving plaintiff, a reasonable jury could conclude that UMS's "resignation" explanation is a complete fabrication, and from the falsity of that explanation infer that the real reason for plaintiff's termination was discrimination.

But even beyond the alleged falsity of the explanation given, there is other evidence from which the jury could reasonably infer that the termination was gender motivated.  It was Nickles who first contended that plaintiff resigned, when he called Bobby Smith the day plaintiff left work after her confrontation with D'Angelo.  Nickels reported to Smith that plaintiff had quit, was going to the unemployment agency, and would return "with a vengeance."  From this report, Smith met with plaintiff the next day to "accept her resignation."  Nickles also was the supervisor who told plaintiff that males were better suited to be lead forepersons than women.  While this is not direct evidence that plaintiff's later termination was gender motivated, it is circumstantial evidence of it.  See Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004) (A supervisor's "alleged statement that 'women aren't typically in that type of position' could allow a reasonable factfinder to infer discriminatory animus.").  Although Smith, not Nickles, was the decisionmaker, he acted almost

entirely on the information supplied to him by Nickles.  That the alleged fabrication of the plaintiff's resignation was coming from Nickles, who had expressed gender-based discriminatory animus before, could allow a reasonable jury to infer that Nickles was motivated by that animus when he reported falsely that plaintiff had resigned.  These facts, if believed by a jury, are sufficient circumstantial evidence supporting an inference that plaintiff's termination by Smith was motivated by her gender.  Thus, defendant's motion for summary judgment on this discriminatory discharge claim is due to be denied.

There also is evidence supporting an inference that plaintiff's termination was motivated by retaliation for her having complained about sexual discrimination in the workplace at UMS.  It is undisputed that, on several occasions within mere days or weeks before her termination, she had complained about sex discrimination to Nickles, Smith, and Ted LaVenture, the general manager of operations for UMS.  She complained specifically that she was not being treated fairly because she is a woman in that she was not being recognized as a lead (after being told she was given the position) and not being allowed to drive a work truck home, as the male leads were allowed to do.  When she complained about this to Nickles, he told her that a man would be in a better position to handle the job as a lead.  Additionally, Nickles told plaintiff that, by complaining, she was "going to mess it up for everyone."  See Doc. 38-1, McCay Depo, pp. 93-95.  A reasonable jury could infer from these facts that Nickles was motivated by a desire to retaliate against plaintiff for her complaints of discrimination, and that that motivation tainted the decision to terminate plaintiff's employment based on the information Nickles communicated to Smith.

For these reasons, the motion for summary judgment as to any claim alleging wrongful termination is due to be denied.  There are genuine disputes of fact relating to how plaintiff's employment came to an end, and whether it was due to either (or both) sexual discrimination or retaliation for her complaints of discrimination.

## <u>RECOMMENDATION</u>

Based on the foregoing the magistrate judge RECOMMENDS that the motion for summary judgment filed by UMS (doc. 36) be GRANTED IN PART AND DENIED IN PART.  The motion as to plaintiff's claims arising from a denial of promotion, hostile work environment/sexual harassment, or constructive discharge are due to be DISMISSED WITH PREJUDICE.  The motion as to remaining claims of disparate treatment in terms and conditions of employment, discriminatory discharge, and retaliation is due to be DENIED.

Any party may file specific written objections to this report and recommendation within fifteen (15) days from the date it is filed in the office of the Clerk.  Failure to file written objections to the proposed findings and recommendations contained in this report and recommendation within fifteen (15) days from the date it is filed shall bar an aggrieved party from attacking the factual findings on appeal.  Written objections shall specifically identify the portions of the proposed findings and recommendation to which objection is made and the specific basis for objection.  A copy of the objections must be served upon all other parties to the action.

DATED the 12th day of April, 2012.

T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE

14